## Vik-Kel Corp. v. Department of Environmental Resources

*Patti J. Saunders,* for Commonwealth.
*John R. McGinley, Jr.,* for appellant.
*John Campfield,* for intervenor (Township of Sewickley).

MAZULLO, Member, July 13, 1983—This matter arises from the appeal of Vik-Kel Corporation from the denial, by DER, of three applications for solid waste management permits. One of the applications involved a disposal site for sludge generated in sewage treatment plants. This site was to be located in Hempfield Township, Westmoreland County. The other two applications covered contiguous parcels of property located in Sewickley Township, Westmoreland County. One of the Sewickley applications was for an oil separator facility, the other was for an agricultural disposal site for septic tank pumpings. Separate petitions to intervene in this matter were filed and granted on behalf of Sewickley Township (township) and an unincorporated citizens group identified as the Concerned Citizens of Madison (citizens). Madison is an unincorporated settled area located within Sewickley Township a portion of which is within a few hundred yards of the proposed sludge and oil separator sites. The township and citizens are, along with DER, parties appellees in the above matter.

A hearing was held in the above-matter on February 22, 23 and 24, 1983 before the Honorable Dennis J. Harnish, then Chairman of the board. Following receipt of briefs Mr. Harnish, as hearing examiner authorized by this board, prepared a pro-

posed adjudication in the above-matter which adjudication has been reviewed and approved by both the sitting members of the board.

## FINDINGS OF FACT

1. Charles E. Lutz, Basil Lutz, Basol Lutz and Basilous Lutz are the same person.

2. Dorothy C. Lutz, Dorothy Lutz, Dorothy C. Baker, Dorothy Catherine Lutz, and Mrs. Charles E. Lutz are the same person.

3. Charles E. Lutz and Dorothy C. Lutz are husband and wife, and the parents of Gregory Lutz and Charles P. Lutz, who is also known as Paul Lutz.

4. Appellant Vik-Kel Corporation (Vik-Kel) is a corporation organized by Charles E. Lutz and existing under the laws of the State of Delaware with a place of business located at Box 333, Madison, Pa. 15663.

5. Charles E. Lutz was the president of Vik-Kel prior to November of 1981.

6. Dorothy C. Lutz was formerly the vice-president of Vik-Kel and is presently its secretary-treasurer.

7. Gregory Lutz was formerly an employee of Vik-Kel and is currently its president.

8. Charles P. Lutz was formerly an employee of Vik-Kel and is currently its vice-president.

9. Charles E. Lutz continues to be involved in the business affairs of Vik-Kel.

10. On or before May 16, 1974, Charles E. Lutz, doing business as Keystone Septic Tank Service, disposed of septic tank pumpings and waste oil on the hill above Placid Manor Mobile Home Park along Beaver Road, Hempfield Township, Westmoreland County, without authorization by permit and in a manner which resulted in runoff onto

Placid Manor Mobile Home Park, pollution of waters of the Commonwealth and a nuisance condition.

11. On or before May 27, 1976, Charles E. Lutz dumped five truckloads of septic tank pumpings and other wastes on his property adjacent to U.S. Route 30 between the house and barn without authorization by permit.

12. On June 18, 1980, the department issued Solid Waste Permit 601690 to Basil and Dorothy C. Lutz, authorizing the disposal of 275,000 gallons of sewage sludge on 9.9 acres of land in Hempfield Township, Westmoreland County (Lutz Recycling Site). Between May, 1980 and June, 1981 Vik-Kel disposed of approximately 1.7 million gallons of sewage sludge at and adjacent to the Lutz Recycling Site.

13. Soil analyses of the Lutz Recycling Site indicate that following this sludge dumping the concentrations of copper, nickel, mercury, cadium, chromium, lead and zinc exceed the maximum safe levels for soils.

14. On or before February 26, 1981, Vik-Kel disposed of sewage sludge on land adjacent to the Lutz Recycling Site not authorized by Solid Waste Permit 601690 or any other permit.

15. On February 26, 1981 Vik-Kel had failed to incorporate all sewage sludge within 24 hours after application at and adjacent to the Lutz Recycling Site.

16. On or before February 26, 1981, Vik-Kel applied sewage sludge to frozen ground at and adjacent to the Lutz Recycling Site.

17. On or before February 26, 1981, Vik-Kel applied sewage sludge to saturated ground at and adjacent to the lutz Recycling Site.

18. On or before February 26, 1981, Vik-Kel allowed sewage sludge to pond on the surface and run off the fields at and adjacent to the Lutz Recycling Site.

19. On or before February 26, 1981, Vik-Kel failed to contour plow the fields at and adjacent to the Lutz Recycling Site.

20. On and before February 26, 1981, Vik-Kel failed to properly revegetate the Lutz Recycling Site and affected adjacent areas.

21. On and before February 26, 1981, Vik-Kel failed to maintain its operational records in proper order.

22. On June 18, 1981, Solid Waste Permit 601690 expired.

23. On or before April 22, 1982, Vik-Kel dumped sewage sludge at and adjacent to the Lutz Recycling Site without authorization by permit.

24. On April 22, 1982, Charles E. Lutz hindered department employees' performance of their duty to investigate unauthorized dumping of solid waste.

25. During the fall and winter of 1981, Charles E. Lutz cleaned up a fuel oil spill and contaminated soil at the Jeannette Sewage Treatment Plant which fuel oil came from the adjacent Hockensmith plant.

26. When first approached by the department, Charles E. Lutz refused to show the department records of the disposition of this clean-up waste.

27. Charles E. Lutz finally told the department that he had disposed of the clean-up waste at Kelly Run Sanitation, Inc.

28. Kelly Run Sanitation, Inc. did not receive all, if any, of the clean-up waste.

29. The department never received a Module I application requesting authorization nor did it even issue a Module I granting authorization to dispose of the clean-up waste.

30. The records submitted by Charles Lutz to prove that he took said clean-up waste to Kelly Run Sanitation, Inc. were forgeries.

31. Charles Lutz on several occasions admitted to lying with regard to phonebook descriptions of his business activities then attempted to recant this testimony.

32. Charles Lutz also attempted to recant his testimony concerning gallonage of sludge spreading figures he had allegedly shown the department's inspector.

33. Mr. Lutz's testimony concerning Mary Zakutney was refuted by Mary Zakutney, a disinterested witness.

## DISCUSSION

On April 3, 1981 DER received an application from Vik-Kel Corporation in which Vik-Kel sought a permit to utilize septic tank wastes for agricultural purposes (Ag site). This application, which was identified by DER as No. 601976, was denied by a letter dated June 1, 1982. Mr. Charles A. Duritsa, the draftsman of this letter cited various technical reasons for denying the Vik-Kel application, but most of the letter recited the alleged unlawful conduct of Vik-Kel Corporation, its officers, associates or agents (most especially including Charles Lutz) and based denial upon Sections 503(c) and 503(d) of the Solid Waste Management Act, Act 97, Act of July 7, 1980, 35 P.S. §6018.503(c) and (d).

On February 3, 1981, Vik-Kel applied to DER for a permit for an oil separation plant which plant was to be located in that portion of Sewickley Township, Westmoreland County known as Madison. The Ag site and the oil separation plant were proposed to be located on contiguous parcels. This application,

identified by DER as No. 600828, was denied by Mr. Duritsa in a separate letter dated June 1, 1982 solely upon the compliance history reasons cited in the 601976 denial.

Vik-Kel appealed both of the above denials, along with DER's denial, bearing the same date, of application 601690 for a site located in Hempfield Township, Westmoreland County. Vik-Kel sought to use the Hempfield Township site for agricultural application of sewage sludge. Vik-Kel withdrew its appeal from DER's denial of application 601690 during the first day of hearings and this denial, therefore, will not be discussed further in this adjudication.

With regard to each of the other denials, Vik-Kel and DER both chose to focus on the compliance history portion of the denials. Neither of these parties offered any testimony concerning the technical issues raised by the denial of 601976. Because we hold, for the reasons set forth below, that DER's denial, on the basis of compliance history, was well supported by the applicable law and facts, we will not reach the technical issues. Likewise, we do not need to address the issue raised by the intervenor Sewickley Township, i.e., Vik-Kel's admitted failure to comply with various land use ordinances of the township.

The starting point of our analysis of DER's compliance history denial is to set forth the portion of Act 97 which authorizes and, in some circumstances, requires, DER to consider compliance history under reviewing applications for solid waste management permits.

Sections 503(c) and 503(d) of Act 97 read as follows:

"§6018.503 Granting, denying, renewing, modifying, revoking and suspending permits and licenses

• • •

(c) In carrying out the provisions of this act, the department may deny, suspend, modify, or revoke any permit or license if it finds that the applicant, permittee or licensee has failed or continues to fail to comply with any provision of this act, the act of June 22, 1937 (P.L. 1987, No. 394), known as "The Clean Streams Law," the act of January 8, 1960 (1959 P.L. 2119, No. 787), known as the "Air Pollution Control Act," and the act of November 26, 1978 (P.L. 1375, No. 325), known as the "Dam Safety and Encroachments Act," or any other state or Federal statute relating to environmental protection or to the protection of the public health, safety and welfare; or any rule or regulation of the department; or any order of the department; or any condition of any permit or license issued by the department; or if the department finds that the applicant, permittee or licensee has shown a lack of ability or intention to comply with any provision of this act or any of the acts referred to in this subsection or any rule or regulation of the department or order of the department, or any condition of any permit or license issued by the department as indicated by past or continuing violations. In the case of a corporate applicant, permittee or licensee, the department may deny the issuance of a license or permit if it finds that a principal of the corporation was a principal of another corporation which committed past violations of this act.

(d) Any person or municipality which has engaged in unlawful conduct as defined in this act, or whose partner, associate, officer, parent corporation, subsidiary corporation, contractor, subcontractor or agent has engaged in such unlawful conduct, shall be denied any permit or license required by this act unless the permit or license application

demonstrates to the satisfaction of the department that the unlawful conduct has been corrected . . ."

In the instant matter the applicant is Vik-Kel Corporation, a Delaware Corporation formed by an individual variously known as Charles E. Lutz, Basil Lutz, Basol Lutz and Basilous Lutz. Mr. Lutz was president of Vik-Kel when the instant applications were filed. Mr. Lutz initially owned 50 percent of the shares of Vik-Kel; his wife, Dorothy owned the remaining 50 percent.

Sometime after filing applications 600976 and 600828, Mr. Lutz, transferred 25 percent of the shares of Vik-Kel to his son Gregory Lutz who became president of Vik-Kel and Mr. Charles Lutz[1] transferred the remaining 25 percent of the shares of Vik-Kel to his son Paul Lutz who became vice-president of Vik-Kel. Dorothy Lutz remained as secretary-treasurer of Vik-Kel.

To all intents and purposes Mr. Charles Lutz continues to exercise control of this corporation. His dominion over the affairs of Vik-Kel was frequently demonstrated on the record. Mr. John J. Schubert of Duncan, Lagnese and Associates, who was Vik-Kel's engineering consultant, and who appeared as a Vik-Kel witness, testified that he had always been paid by Mr. Charles Lutz and that even though he had held conversations with both the younger Lutzes, he considered Charles Lutz to be "the boss" of Vik-Kel. In addition, Paul Lutz couldn't remember whether it was November of 1981 or November of 1982 when he became vice-president of Vik-Kel and Gregory Lutz couldn't recite any action he had taken as president of this corporation.

----

1. Although one of his sons also has the name Charles, Charles Lutz as used throughout this adjudication refers to the father.

In sum, it is apparent that Mr. Charles Lutz was and remains so closely associated with Vik-Kel Corporation that DER was correct to examine his record to see whether Vik-Kel failed to comply with any provision of the acts and permit conditions enumerated in §503(c) of Act 97 or to determine from Mr. Lutz's record, whether Vik-Kel had demonstrated a lack of ability or intention to comply with Act 97.

The review of Mr. Charles Lutz compliance history which follows should, lamentably, better be phrased as a non-compliance history, precious little compliance has been demonstrated. On May 14, 1974 Mr. Lutz was sent a Notice of Violation by DER for dumping septic tank wastes and oily wastes on property along Beaver Road in Hempfield Township. Vik-Kel admitted the violations in this notice. Among other items, this notice informed Mr. Lutz of the necessity to obtain a permit from DER before dumping any similar wastes in the future.

Nevertheless, some two years later, on June 2, 1976, Mr. Lutz received a second Notice of Violation of (N.O.V.) from DER. This second N.O.V. described the dumping of at least five loads of septic tank waste without a permit. Again Vik-Kel and Mr. Lutz admitted that this incident occurred. Mr. Lutz tried to mitigate this second incident by testifying that he had submitted an application for a solid waste disposal permit to DER in 1976 after receiving the second N.O.V. This testimony, like much of Mr. Lutz's testimony, however, seemed to weave a tangled web in which he caught himself.

Neither of DER's custodians of records, Mr. Charles A. Duritsa or James Brahosky, could remember receiving the 1976 application and Mr. Duritsa testified that it was not presently in DER's files.

Also, it seems strange that if Mr. Lutz paid Duncan, Langese and Associates over $30,000 to prepare the instant applications (as per Mr. Schubert's testimony) that he would not have hired someone to submit a complete application in 1976. The application allegedly submitted to DER was a handwritten, incomplete application.

In any event, even had Mr. Lutz obtained a dumping permit after the fact in 1976 (which even he admits he did not) this would only have mitigated and not eliminated his knowing violation of the Solid Waste Management Act.

By 1980, Mr. Lutz had at last become aware of the necessity to obtain a permit *before* depositing solid waste. On June 18, 1980 Mr. Lutz and his wife and/or mother obtained a permit to land dispose of sewage sludge for agricultural purposes. This permit 601690 covered a 4.4 acre site and a 5.5 acre site both being located in Hempfield Township, Westmoreland County. the layout of these sites, known collectively as the Lutz Recycling Site, is most easily apprehended by reference to Exhibit A in the Appendix to this Adjudication, a map which formed a portion of the application for permit 601690.

Mr. Lutz needed permit 601690 because he had a bid upon and entered a contract with the City of Jeannette to dispose of the sewage sludge produced by the sludge digesters of Jeannette's sewage treatment plant. However, Mr. Lutz knew or should have known that permit 601690 would not have created a sufficient disposal capacity for Jeannette's sludge. The contract was for approximately 1.2 million gallons of sludge to be removed from the sewage treatment plant on a call basis over the year from May of 1980 to June 1981. Permit 601690 authorized disposal of 275,000 gallons of sludge per

year to be applied as per Exhibit B attached hereto (which exhibit also formed a portion of the application for permit 601690).

Mr. Paul Lutz testified that the sewage sludge he pumped from the Jeannette plant was a lot more dilute and thus more voluminous than anticipated because he had to introduce great quantities of fresh water into the sludge (via a fire hydrant) in order to pump the sludge out of the digester.

Paul Lutz's testimony was effectively rebutted by the testimony of Mr. Robert Frye, Jeannette's City Engineer and a disinterested witness in this matter, who testified that fresh water was added only at the end of a pumping cycle when the sludge at the bottom of the digesters became too thick to pump. Mr. Frye estimated that only a couple of hundred gallons of water were added to 200,000 gallons of sludge.

In any event, the rate of sludge loading set forth in its application was within the control of Vik-Kel's consultant when preparing the application for permit 601690 and although Paul Lutz testified that he didn't know that it would be necessary to dilute the sludge until after the permit was issued, it is instructive that Vik-Kel's consultant was never contacted by Vik-Kel with this new information so that its permit could be amended. The relevant DER officials also testified that they also had not been told about this dilution condition.

Here again Mr. Charles Lutz's convenient memory caused him problems. Mr. Lutz testified, at least three places in the record,[2] that on July 30, 1980 he had shown DER's solid waste inspector, Gale Campbell, the gallonage figures for sludge disposal on the Lutz Recycling Site for several months

2. N.T. see 97, 155 and 157.

which gallonage figures greatly exceed the total amount which was supposed to be spread by the entire year.[3] Mr. Lutz identified appellant's Exhibit 11, the back of an envelope which had contained Inc. Magazine, as the envelope he had shown Mr. Campbell. When Mr. Lutz was confronted with the fact, to which his counsel stipulated, that the envelope in question was not printed, let alone distributed, until long after July 30, 1980, Mr. Lutz again attempted to recant his testimony.

In summation of this section, we find (on the basis of the admissions of Vik-Kel and the Lutzes) that Vik-Kel, with Mr. Lutz's knowledge and intent, far exceeded the sludge loading rates for the Lutz Recycling Site. Instead of the 275,000 gallons called for in the permit Vik-Kel, applied all of the approximately 1.5 million gallons of sludge it removed from Jeannette during the period of May 1980 to June 1981 to the said Lutz Recycling Site. Moreover, we find, on the basis of an analysis of composite soils samples taken by DER soils scientist, William Graham, that this over-application of sludge caused DER's guidelines for the maximum life time loading of this site to be exceeded for each of the heavy metals; cadmium, copper, chromium, lead, mercury, nickel and zinc on the 5.5 acre portion of the Lutz Recycling Site and to be exceeded for all metals except cadmium on the 4.4 acre site. In evaluating the effects of Lutz's violations it must be borne in mind that the projected life of the Lutz Recycling Site had been almost 30 years; it was more than used up in one year.

The next incidents of noncompliance by Mr. Lutz were documented in the N.O.V. of March 13, 1981

---

3. Vik-Kel was attempting to set up the factual underpinnings for an estoppel argument against DER.

which N.O.V. listed a number of operational violations at the Lutz Recycling Site observed during a February 26, 1981 site inspection, see Findings of Fact 16 through 22. Rather than contest the validity of these operational violations which included dumping off the permit, dumping sludge on frozen and/or saturated ground, ponding, runoff, failure to plow and failure to maintain operational records, Vik-Kel admitted them too.

Mr. Lutz testified that in late 1981 or early 1982 he cleaned-up some kerosene which had spilled at the Hockensmith Company site contiguous to the Jeannette STP. Under contract with Hockensmith Mr. Lutz testified that he removed four 8-ton truck loads of oily dirt from the Hockensmith site. Mr. Lutz denied to DER officials that he dumped this oily dirt on his own site or another unpermitted area. Rather, testified Mr. Lutz, he took all 4 loads to the Kelly Run Sanitation site after clearing it with Mr. Gary Fiore, Kelly Run's superintendent. Mr. Lutz even produced receipts from Kelly Run to corroborate his testimony. Mr. Lutz accounted for the poor handwriting on these landfill receipts by noting that the gatekeeper of Kelly Run had a broken writing hand at the time.

Mr. Lutz's testimony was again rebutted by the testimony of other, more credible, witnesses. Mr. Gary Fiore did remember talking with a man who identified himself merely as Charles but instead of oily dirt, Mr. Fiore testified that Charles said he had cleaned a gas station and had a load of mostly rubbish with only a small amount of oily dirt from floor sweepings. Nevertheless, Mr. Fiore's suspicions were aroused by this conversation and he alerted his gateman, Michael Dworek, to be on the lookout for such a load and to give it uncommon scrutiny.

Apparently, when Charles Lutz did show up at Kelly Run, on January 20, 1982, his load did not arouse Michael Dworek's suspicion. According to receipt 10 on Commonwealth's 6, which Mr. Dworek identified as bearing his printing, Mr. Lutz paid $15 to dump this load and was not required to supply a DER Module 1 or to pay a special fee, both of which would have been required for oily dirt.

Mr. Dworek, however, denied writing the script portion of landfill receipt 10 or any portion of any of the other three landfill receipts on Commonwealth 6. Indeed, both Mr. Dworek and Mr. Fiore testified that Mr. Dworek only printed and never wrote in script. Mr. Dworek did agree that the other landfill receipts on Commonwealth 6 were on Kelly Run forms. However, since every cashbook is numbered 1 through 50 and since Mr. Dworek had a number of such cashbooks in plain view in his gatehouse the use of the Kelly Run landfill receipts does not give rise to a necessary inference that these receipts were issued by Kelly Run; it is also possible that someone purloined a cashbook and forged three of the four receipts. We find these receipts to be forgeries and the submission of these forgeries by Mr. Charles Lutz undermines any remaining credibility he might have in our eyes.[4] At the risk of redundancy the record also discloses two other slips of Mr. Lutz's tongue. Mr. Lutz testified that former Sewickley Township Supervisor, Mary Zakutney had come to the site of Lutz's proposed oil separator and told him at that place and time that he need not

---

4. The board commends Mr. Fiore for appearing and testifying since prior to testifying Mr. Fiore received a phone call from a person claiming to represent Vik-Kel Corporation who told him that "I should be sick the day of the hearing and that if they went down the tubes they would take someone else with them."

comply with Sewickley Township's ordinances. Mary Zakutney, now a retired supervisor of Sewickley Township and an acquaintance of Mr. Lutz since 1935, who was not alleged to have had, yet alone demonstrated to have, any bias or interest adverse to Mr. Lutz, or Vik-Kel, testified that she had never been to the site of the proposed oil separator and that she had never had any conversation at any time or place with Mr. Lutz regarding his proposed oil separator.

Finally, on the issue of Mr. Lutz's credibility, he is condemned by his own testimony. When confronted with an entry in the Greensburg telephone directory which alleged that he was a licensed transporter of hazardous waste, Mr. Lutz admitted three times to lying in his phone advertisement (lying was his phrase) his only excuse being that his competitors lied too. The next morning Mr. Lutz tried to recant his testimony by alleging that he had obtained a license from EPA. The problem with this recantation is that EPA simply does not *license* transporters of hazardous waste; it has no authority to do so under its enabling legislation. DER, which does have the authority to license such transporters under Act 97, denied Mr. Lutz's application for a transporter's license.

It's hard to believe that this recitation of Mr. Lutz's noncompliance is not yet concluded but one more incident needs to be discussed. On April 22, 1982 Mr. Charles E. Lutz violated the Solid Waste Management Act by dumping sewage sludge without a permit at his property off Route 30 in Hempfield Township. The DER employees who investigated this incident, Rita A. Coleman, a soils scientist and Randall Walton, a solid waste specialist, were able, by using their eyes and noses to ascertain that sewage sludge and an oily sub-

stance had been dumped on Mr. Lutz's property. Unfortunately, they were not able to document this unpermitted dumping with photographs and samples.

Mr. Walton did take samples of the ponded substance in a sample bottle but Mr. Charles Lutz, after rushing to the scene in his truck, grabbed the sample bottle from Mr. Walton's hand and threw it in the back of his (Mr. Lutz's) truck. Then he wrestled with Miss Coleman—a physically slight woman—when she refused to hand her camera to Mr. Lutz. When Miss Coleman tossed the camera to Mr. Walton in an effort to be rid of Mr. Lutz's harsh embrace, Mr. Walton dropped the camera and Mr. Lutz, moving with surprising force and swiftness for one 60-years of age retrieved and opened the camera. The most surprising thing about this incident is that Mr. Lutz did not seriously deny any of the above conduct. He merely described his anger at DER for not granting him any more permits.

This sorry record of flagrant misconduct and duplicity satisfies both parts of §503(c). Not only does it demonstrate multiple violations of the Solid Waste Management Act, it also demonstrates a complete lack of trustworthiness on behalf of Mr. Lutz—i.e., a decided lack of ability and intention on the part of Mr. Lutz, and therefore of his alter-ego, Vik-Kel, to comply with the Solid Waste Management Act.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter.

2. In a permit denial case the applicant has the burden of proving that DER abused its discretion or violated law in denying the application; Vik-Kel has failed to meet this burden.

3. The disposal of solid waste without a permit from the department is unlawful under Sections 501 and 610 of the Solid Waste Management Act, the Act of July 7, 1980, P.L. 380, 35 P.S. §§6018.501 and 6018.610.

4. The disposal of solid waste contrary to the rules and regulations of the Environmental Quality Board is unlawful pursuant to Section 610 of the Solid Waste Management Act, 35 P.S. §6018.610.

5. The disposal of solid waste contrary to permit conditions is unlawful pursuant to Section 610 of the Solid Waste Management Act, 35 P.S. §6018.610.

6. The department may deny a permit if it finds that the applicant has failed or continues to fail to comply with the Solid Waste Management Act; any other environmental statutes or conditions in a permit issued by department; or if the department finds that the applicant has shown a lack of ability or intention to comply with environmental statutes, regulations or permit conditions, as indicated by past or continuing violations. See Section 503(c) of the Solid Waste Management Act, 35 P.S. §6018.503(c).

7. Hindering department employees in the performance of their duty to investigate unauthorized disposal of solid waste is unlawful. See Section 610 of the Solid Waste Management Act, 35 P.S. §6018.610.

8. The department has a duty to ensure that the land disposal of sewage sludge does not create environmental harm, a public health hazard or public nuisance. Article I, Section 27 of the Pennsylvania Constitution; Sections 102 and 104 of the Solid Waste Management Act, 35 P.S. §§6018.102 and 6018.104.

9. The department has the authority to establish the standards and conditions under which an activ-

ity which creates a danger of pollution of Commonwealth waters shall be conducted. Section 104(7) of the Solid Waste Management Act, 35 P.S. §6108.104(7); Section 402 of the Clean Streams Law, the Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.402.

10. The department cannot issues a permit that would have the effect of increasing the heavy metal concentrations in soil that already exceeds the maximum safe levels of heavy metals. Article I, Section 27 of the Pennsylvania Constitution; 25 Pa. Code §.75.32(c)(1).

11. Sewage sludge must be incorporated within twenty-four (24) hours after application. 25 Pa. Code §75.32(c)(2).

12. Sewage sludge is not to be applied to saturated or frozen ground. 25 Pa. Code §75.32(c)(3).

13. Sewage sludge shall be applied so as to prevent ponding. 25 Pa. Code §75.32(c)(4).

14. Sewage sludge shall be applied so as to prevent runoff. 25 Pa. Code §75.32(c)(8).

## ORDER

And now, this July 13, 1983, Vik-Kel's appeals from DER's denial of Vik-Kel's applications 600828 and 600976 are both dismissed.